UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CENTERFOLDS, INC. | : | |
| AND MARIO PIROZZOLI, JR. | : | NO.:  3:02CV2006 (WWE) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF BERLIN, BONNIE L. | : | |
| THERRIEN, IDA RAGAZZI, JOANNE | : | |
| WARD, JOSEPH ARESIMOWICZ AND | : | |
| LINDA CIMADON | : | FEBRUARY 23, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.  BACKGROUND AND FACTS

This case was brought by way of Complaint dated November 12, 2002 as a result of the Town of Berlin's attempted enforcement efforts to revoke the plaintiffs' permit to operate an exotic dance club for violating the Town ordinance concerning sexually oriented businesses.  After notice and a full hearing, the Town Council's 4-4 vote did not result in a revocation of plaintiffs' permit. Despite the result of the Council's vote, plaintiffs claim a violation of Centerfolds' procedural due process rights against the individual council members who voted against it.  In addition, the plaintiffs claim that portions of the Town's ordinance concerning sexually orientated businesses violate the First Amendment.

### A.    History of Enforcement Action.

Centerfolds operates a cabaret[1] featuring live adult entertainment [2] and previously obtained a license to operate a sexually oriented business establishment in accordance with Berlin's ordinance.  (The license is attached as **Exhibit A**). Centerfolds' license requires it to comply with all requirements of Berlin's "ordinance concerning sexually oriented businesses." (Hereinafter "The ordinance", attached as **Exhibit B**). The ordinance provides, in Section 4(a)(1):

> No licensee, operator or employee of a sexually oriented business shall perform or permit to be performed, offer to perform, or allow patrons to perform any live performance or conduct featuring any specified sexual activities on the licensed premises.

In the definition section, "specified sexual activities" includes  "fondling or erotic touching of…. female breasts" and "lap dancing." §§3, 4.  In addition, §5 of the ordinance provides:

> (d)    No entertainer, either before, during or after a performance, shall have physical contact with any patron of a sexually oriented business while on the licensed premises.

---

[1] "Adult cabaret means any nightclub, bar, restaurant or similar commercial establishment, whether or not alcoholic beverages are served, which regularly features (1) persons who appear nude or semi-nude, (2) live performances that are characterized by the exposure of specified anatomical areas, or (3) films, motion pictures, video cassettes, slides or other photographs reproductions that are characterized by the depiction or description of specified anatomical areas or specified sexual activities."  **Exhibit A**, Section 2 (c).

[2] "Live adult entertainment means any live performance by a person who appears nude or semi-nude or any live performance that is characterized by the exposure of specified anatomical areas." Id., (q)

2

Centerfolds is also regulated by the State of Connecticut Department of Consumer Protection, Liquor Control Division, which has similar restrictions regarding the conduct permitted on the premises of cabarets featuring live adult entertainment.  See Conn. Regs State Agencies § 30-6-A24.  On July 1, 2002, defendant and Town Manager Bonnie Therrien read in the newspaper that the State of Connecticut Liquor Division was going to revoke the plaintiffs' liquor permit based upon based upon the Division's investigation which found that employees of the plaintiffs' business were giving "lap dances" to customers, as well as engaging in other sexual activities. **Exhibit C**, Transcript of Revocation Hearing dated August 27, 2002; **Exhibit V**, Affidavit of Bonnie Therrien. Ms. Therrien requested a copy of the Division's investigation and reports through the Freedom of Information Act.  **Exhibits C, V** and **Exhibit D,** Letter to Ms. Ayala, Liquor Division, from Ms. Therrien dated July 1, 2002.  She reviewed the reports of activities which were documented by officers of the state Liquor Control Division through their undercover investigation which occurred on August 19, 2001. **Exhibit E**, Liquor Control Division Report of August 19, 2001.  She also found that activities documented by the officers violated Berlin's ordinance, which prohibited certain "specified sexual activities", defined as "sexual physical contact between employees and patrons of sexually oriented businesses" and specifically included "lap dancing" or "manual or oral touching or fondling of specified anatomical areas, whether clothed or unclothed."  **Exhibits B** and **V**.

3

She also found that the officers observed dancers exposing their breasts, pubic hair and genitals; touching, caressing and/or fondling their breasts; and having physical contact with the patrons.  **Exhibit C**, p 3.

As a result, Ms. Therrien revoked the permit under Section 12(b)(8) which provided, "the Town Manager shall revoke any license where any of the following occur:…(8) A licensee, operator or employee has knowingly allowed any live performance or conduct featuring any specified sexual activities to occur on the licensed premises;…" **Exhibit V**.

In accordance with §12 of the ordinance, Ms. Therrien then wrote Centerfolds on July 15, 2002, advising it that the Town would be revoking its license.  **Id.**; **Exhibit C**; **Exhibit F**, Letter to Mr. Mario M. Pirozzoli, Jr./ Centerfolds from Ms. Therrien dated July 15, 2002.  Ms. Therrien also advised Centerfolds of its right to appeal her revocation, as permitted by the ordinance. **Exhibit F**.  She based her decision on the occurrence of a number of activities that constituted "specific sexual activities" in violation of the ordinance definition of specified sexual activities.  **Exhibit C**, p. 13

As part of the appeal process, the ordinance allows an aggrieved party to request a public hearing where it can present evidence and have a right to cross-examine all Town officials and witnesses.  **Exhibit B**.  Centerfolds exercised this right to appeal and a public hearing was held on August 27, 2002. During the pendency of the appeal, the Town Manager's revocation of

Centerfolds' license was stayed pursuant to the ordinance.  **Exhibit B**.  **Exhibit G**, Written Application of Appeal.  Plaintiff was represented by counsel and was given an opportunity to present evidence, cross-examine witnesses and to submit written comments. **Exhibits C** and **H**, Centerfolds' Closing Argument and Memorandum of Law.  At the hearing, Centerfolds, in essence, conceded that physical contact and "lap dancing" was occurring on the premises and instead attacked the Town's proof that a manager or supervisor at Centerfolds had knowledge of the violations which were occurring on Centerfolds' premises.  **Exhibits C** and **H.**

At the hearing, Ms. Therrien provided testimony and explained the basis for her decision to revoke plaintiffs' permit to the Town Council  **Exhibit C**, p. 1-3.  She testified that the activities documented by the Liquor Division investigators violated Berlin's ordinance.  Id.  In addition, she called an investigator from the Liquor Control Division as a witness, who gave testimony before the Town Council.  During his undercover investigation, he observed a dancer walk back to a lap dance area with a man, and she then immediately removed her clothing down to her g-string and rubbed her leg up and down his groin area, rubbing her face back and forth in his groin.  She then caressed and touched her exposed breasts, and would sit and pull her g-string to the side "exposing completely her genital area."  Id., pp. 14-15.  Ms. Therrien introduced the Liquor Control Division report, which was entered into evidence.  **Exhibit E**.   This report documented

the Division's investigations of Centerfolds and numerous instances of violations

of the State's liquor laws which contain similar prohibitions as the Berlin

ordinance. Id.

The August 19, 2001 report made by the officers documented that a

dancer exposed her breasts, pubic hair and genitals, and she permitted a patron

to kiss and lick her breasts, as follows:

> At approximately 12:20 a.m., a female performer, later identified as Racquel A. Velez (who went by the stage name Adrianna) entered the main stage area and began to dance. She was wearing a green and white colored bikini top, black shorts, and black high-heel boots. As Ms. Valez danced, she removed her shorts, revealing a black g-string bottom, and lowered her bikini top so as to completely expose her breasts.  As Ms. Valez dances, patrons placed dollar bills on the stage in front of themselves.  Ms. Valez then moved around the stage, collecting the bills and dancing in front of the patrons who had placed them on the stage.  While dancing in front of these patrons she would touch, caress and fondle her breasts.  Ms. Valez would then lean over the edge of the stage and place her breasts against the patron's face and allow the patron to kiss and lick her breasts.  Ms. Velez would also sit on the stage facing the patron and with her legs spread would move her g-string to the side exposing her public hair and genitals.
>
> Another dancer was observed: to walk into a separate booth to the rear right of the premises.  Saunders was then observed to stand in front of a male, now seating and remove her clothing down to her "G" string.  Saunders was then observed to begin rubbing her right leg up an down on the male patron's groin area.  After a brief period the dancer moved to her knees and then began pressing her face directly into the male's groin area. She also danced on stage topless and caressed and fondled her exposed breast.  She then sat on the stage floor and while facing the patron briefly pulled the "G" string to the side exposing her genital area.  After a brief period she leaned forward and removed the currency and proceeded to the next person showing money.

**Exhibit E**.  Other dancers were also observed wearing only a g-string and shoes rubbing up and down the front of a patron and rubbing her breasts against another patron's chest, while the patrons were seated in a private dance booth. Id.

On September 10, 2002, the issue of whether to sustain the revocation by the Town Manager was put to the Council for a vote.  **Exhibit I**, Transcript of Revocation Hearing dated September 10, 2002.  Four members of the Council, defendants Aresimowicz, Cimadon, Ward and Ragazzi, voted to sustain the license revocation.  Id. The other four members voted to overrule Ms. Therrien's revocation.  Id.

The Town Attorney interpreted the tie as a vote not to sustain the Town Manager's revocation, and as a result, and the revocation was rescinded. **Exhibit J**, Letter to Ms. Therrien from Attorney E. Timothy Sullivan, Jr. dated September 13, 2002; **Exhibit K**, Letter to Mario M. Pirozzoli, Jr./ Centerfolds from Ms. Therrien dated September 18, 2002.

Centerfolds did not close its business even for one day as a result of the Town Manager's actions.  **Exhibit B.**

Although unrelated to Centerfolds' license revocation hearing, an event which occurred on September 10, 2002 bears relation.  Some of the members of the Council met prior to the meeting to discuss the surprise announcement they

heard at the beginning of the meeting that there would be a vacancy in the

Deputy Mayor's position, and the Mayor wanted to unilaterally choose the

successor. **Exhibit L**, Deposition Transcript of Defendant Ida Ragazzi, p. 50, ln

9- p.51, ln 1. The Council members did not discuss the issue of Centerfolds

license or how they intended to vote on the Centerfolds issue before them.

**Exhibit L** and **Exhibit M,** Deposition Transcript of Defendant Joseph

Aresimowicz, p. 26, ln 12-22.

     **B.**    **Plaintiffs' Legal Claims.**

     Plaintiffs' complaint alleges violations of their procedural due process

rights and alleges a facial challenge to portions of the sexually oriented business

ordinance on First Amendment grounds. Plaintiff alleges the ordinance is

defective because:

     1. The ordinance is irrational  (Complaint, ¶26);

     2. The ordinance fails to distinguish between illegal acts, such as prostitution, and simulated acts of sexual conduct that violate no known laws, and which pose no threat of safety to any community or to anyone. (Complaint ¶ 27);

     3. The ordinance's description of enterprises composed of "booths, cubicles, studios and rooms" bears no relation to the plaintiff's enterprise, and are, in fact, a thinly veiled attempt to put the plaintiffs out of business by treating his business as of the same sort and type as those in which such illegal activities as prostitution occur.  (Complaint, ¶28); and

     4. The ordinance is overbroad in that it prohibits innocent contact between performers and patrons. (Complaint ¶ 29).

**C.**     **History of Enactment of Berlin's Sexually Oriented Business Ordinance.**

On October 19, 1999, the Town Council passed a moratorium on all new sexually oriented businesses so that the ordinance committee could research and draft an ordinance for this type of business.  **Exhibit N**, Minutes of Special Town Council Meeting, October 19, 1999.  The moratorium was extended an additional 3 months while the work on the ordinance was completed.  **Exhibit O**, Minutes of Town Council Meeting, March 21, 2000.  A public hearing was held on the ordinance on June 13, 2000 and the Town Council passed the ordinance on June 20, 2000.  **Exhibit P**, Minutes of Town Council Meeting, June 20, 2000. The ordinance committee, which included defendants Ragazzi and Ward, prepared a "Sexually Oriented Business Summary" accompanying the proposed ordinance.  **Exhibit Q,** Sexually Oriented Business Summary.  This Summary cites to the experiences of other Connecticut and national municipalities in dealing with the negative secondary effects of such businesses if permitted without regulation.  "Such negative secondary effects include, but are not limited to, an increase in high-risk sexual activity and prostitution, resulting in higher risk of public exposure to communicable diseases and AIDS, property devaluement, increased criminal activity, and a decline of retail trade."  The Summary also states, "The Town of Berlin, like other municipalities, is susceptible to the proven secondary effects of SOBs.  Of particular concern to Berlin is the existence of the

Berlin Turnpike, a major commercial thoroughfare that bisects the Town.  The

Berlin Turnpike has been a magnet for SOBs and, with its increased

development, will continue to attract these types of businesses.  Other areas of

Berlin have been and will continue to be targets of SOBs." **Exhibit Q.**

The Summary provides an overview of First Amendment jurisprudence and

concludes with a statement of the Council's purpose and intent in enacting the

ordinance, and a summary of the research conducted, as follows:

> The Town Council for the Town of Berlin wishes to protect its
> citizens and community from the adverse secondary effects of
> SOBs that have been experienced in other communities.  These
> harmful secondary effects include: (1) an increase in the risk of
> communicable diseases, including AIDS and Hepatitis B; (2) an
> increase in crime, especially sex-related crime; (3) decline in
> property values; and (4) unsanitary public places.  The Town has a
> substantial government interest in protecting, preserving and
> promoting the health, safety and welfare of its citizens and those
> persons who patronize Berlin businesses and establishments.
> Proposed Ordinance 3-00, An Ordinance Concerning Sexually
> Oriented Businesses, has been introduced to accomplish the goals
> of the Town Council by regulating SOBs so that the occurrence of
> the harmful secondary effects that result from the unregulated
> operation of such businesses is lessened.
>
> The Town Council Ordinance Committee conducted a thorough
> review of existing legislation and court decisions addressing SOBs.
> Unlike other Connecticut municipalities that have adopted SOB
> ordinances, Berlin's proposed ordinance represents an all-
> encompassing yet narrowly tailored regulation of the SOB industry
> that is consistent with existing law.  The ordinance's licensing
> procedure is thorough, extensive and specific, and is tailored to
> Berlin's governmental structure.  The proposed ordinance is at the
> cutting edge of SOB ordinances in Connecticut and, depending on

the development of the law in this area, should serve the Town well for years to come.

Of particular concern and one of the motivating factors of the Council and ordinance committee was the fact that Hartford had problems with the adverse secondary effects of SOBs such as crime and prostitution. **Exhibit L.** The intent of the Berlin Town Council in enacting the sexually oriented business ordinance was to combat the adverse secondary effects of this type of business. **Exhibit B** and **Exhibit Q.**

The text of the ordinance itself also establishes the Town's concern for adverse secondary effects associated with sexually oriented businesses:

Section 1—Declaration of Policy.

The Town Council of the Town of Berlin, Connecticut finds:

> (a) The operation of sexually oriented businesses in the Town requires special regulation and supervision by the Town to protect, preserve and promote the health, safety and welfare of the patrons of such businesses, as well as the health, safety and welfare of the Town's residents.  Further, protecting order and morality, preserving the character and preventing deterioration of the Town's neighborhoods, promoting retail trade, maintaining property values, and ensuring sanitary and safe public places are desirable objectives of the community and its leaders.

> (b) Statistics and studies performed by a substantial number of cities and towns in the United States indicate that male and female prostitutes have been known to frequent such businesses in order to provide sex for hire, such sexual activity and anonymous sexual activity could prove detrimental to the health and safety of others including communicable diseases including the AIDS virus, Hepatitis B and other sexually transmitted diseases (Section 1-(b)(4)and (5).  Sexual activities between employees and patrons of

sexually oriented businesses such as lap dancing, manual or oral touching or fondling of specified anatomical areas (6), an increase in sex crimes, excessive noise, parking problems, presence of discarded sexually oriented material on residential lawns and the performance of sexual acts in public places. (7)  Reasonable regulation tends to discourage prostitution, other related crimes, anonymous and high-risk sexual contact and unsanitary sexual activity, excessive noise and property devaluement.

The Town Council's purpose and intent was to:

[R]egulate sexually oriented businesses to promote the health, safety and general welfare of the residents of the Town and to establish reasonable and uniform regulations of such businesses in order to reduce or eliminate the adverse secondary effects of such sexually oriented businesses,

and not to:

[D]eny to any person rights to speech protected by the Unites states or State Constitutions, nor is it the intent of the Council to impose any additional limitations or restrictions on the content of any communicative materials including sexually oriented film, video-tapes, books or other materials…or to deny or restrict the constitutionally protected rights of any adult to obtain or view any sexually oriented materials under the United States or State Constitutions, nor does it intend to restrict or deny and constitutionally protected rights that distributors or exhibitors of such sexually oriented materials may have to sell, distribute or exhibit such materials.

**Exhibit B.**

The plaintiff has sued the Town Council members who voted to sustain the Town Manger's decision in their individual capacities.  Those members who voted in its favor have not been named as defendants.   The plaintiff has also named Town Manager Therrien in her individual capacity.

## II.    LAW AND ARGUMENT

### A.    Summary Judgment Standard.

Federal Rule of Civil Procedure 56(c) requires the entry of Summary Judgment,". . . if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 Ed.2d 202 (1986).  A "material fact" is one whose resolution will affect the ultimate determination of the case.  Id.  In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S.Ct. at 2513; J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Samuels v. Smith, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256, 106 S.Ct. at 2510; see also, Knight v. United States Fire

Insurance Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 763 (1987); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 265 (1986). "Neither courts nor defendants should be subjected to trials which can be little more than harassment." Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).

When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to the case, which it bears the burden of proving at trial. Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987). Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. See First National Bank of Clinton, Ill. v. Insurance Co. of North America, 606 F.2d 760 (7th Cir. 1979)(in ruling on summary judgment motion, the District Court properly relied on documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay, which does not fall under one or more of the exceptions listed in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 90

S.Ct. 1598, 26 L.Ed.2d 142 (1970); Beyene v. Coleman Security Services, Inc.,
854 F.2d 1179 (9th Cir. 1988); Edward B. Marks Music Corp. v. Stasny Music
Corp., 1 F.R.D. 720 (S.D.N.Y. 1941).

> **B.**    **Plaintiffs' Procedural Due Process Claim Fails
> Because A Pre-Deprivation Hearing was Provided
> and the Plaintiff Prevailed.**

The essence of plaintiffs' procedural due process claim is set forth in ¶21
of the complaint which states "upon information and belief, defendant Ragazzi,
who personally opposes the operation of any adult entertainment facilities in
Berlin sought to deprive the plaintiff of due process of law by caucusing with
defendants Aresimowicz, Cimadon and Ward before any council meeting
designed to hear an appeal of the Town Manager's revocation proceeding."
Thus, despite the plaintiffs' receipt of notice of the charges and a full hearing
including representation by counsel, cross-examination, and an opportunity to
submit a brief, plaintiffs claim the defendants acted inappropriately and outside of
the established procedures.

To state a §1983 claim, the plaintiffs must prove that the defendants
acted under color of law to deprive them of a right under the Constitution. 42
U.S.C. § 1983. Even assuming the truth of plaintiffs' allegations—that the
defendants had some malicious motive to vote against the plaintiffs-- rather than
for violating the Town's ordinance, the plaintiffs' property right in the license was
not affected.

Section 13 of the Ordinance provides the appeal procedure, which the

plaintiffs pursued, as follows:

(a)     Within five (5) days of receipt of notification of a denial, non-renewal, suspension or revocation of a license, the licensee may contest such decision by submitting a written application to the Town Clerk requesting a public hearing before the Town Council.

(b)     The public hearing shall be scheduled to take place no later than twenty (20) days from the date of the application of such hearing.  Not less than ten (10) days before the date of such hearing, a notice of hearing shall be sent to the licensee by certified mail, return receipt requested, and posted in a conspicuous place on the proposed or licenses premises.

(c)     In such application the licensee may request that the Town Manager or any other Town official who investigated the application or inspected the premises shall be present at the public hearing.  At such hearing, the licensee shall have the opportunity to present evidence on his behalf and shall have the right to cross-examine all Town officials and witnesses.  The Town Council shall conduct the hearing in the order and form and with such methods of proof, as it deems fair and appropriate.  The rules regarding the admissibility of evidence shall not be strictly applied, but all testimony shall be given under oath or affirmation.

(d)     Immediately following such hearing, the Town Council shall enter its vote to either sustain or overrule the denial, non-renewal, suspension or revocation.  Within five (5) days after such hearing, the Town Council shall issue written notice of its final decision, stating the reasons therefore, and shall forward such decision to the licensee by certified mail, return receipt requested.  If the denial, non-renewal, suspension or revocation is overruled, the Town Manager shall immediately issue such license or renewal of license, or revoke the suspension or revocation, as the case may be.

(e)     The decision of the Town Council may be appealed to the Superior Court within (20) days of such written notice of such decision.

16

(f)     During the pendency of any appeal of a non-renewal, suspension or revocation, the operations of the sexually oriented business   may be maintained by the licensee, unless otherwise ordered by the Superior Court.

**Exhibit B.**  The revocation of plaintiffs' license was stayed under the above provision.  Therefore, there is no "deprivation" to be remedied by way of this § 1983 action.[3]

Furthermore, there is no evidence that the defendants' caucus involved any impermissible conduct.  Both council members Ragazzi and Aresimowicz testified to the contrary.  **Exhibits L** and **M**.  The discussion that night concerned the Mayor's attempt to hand pick a Deputy Mayor to fill a vacancy in that position. Id.; See also **Exhibits N, O, P,** and **Q**. The council members did not discuss the plaintiffs' license revocation. Id.  Therefore, the undisputed facts show no procedural due process violation occurred and the defendants are entitled to judgment as a matter of law.

**C.     The Individual Defendants are Entitled to Absolute Immunity for their Quasi-Judicial Acts.**

Absolute judicial immunity from suit under §1983 is not reserved for judges alone, but is granted to any person performing judicial or quasi –judicial

---

[3]  Furthermore, to state a claim under § 1983 for a procedural due process violation, the plaintiffs must prove that any post-deprivation remedies are unconstitutional.  Hellenic Am. Neighborhood v. City of New York, 101 F.3d 877 (2d Cir. 1996).  The Due Process Clause is not violated when a state actor intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post-deprivation remedy.  Hudson v. Palmer, 468 U.S. 517, 531, 533 (1984).  The ordinance in this case expressly provides a right of appeal to the Connecticut Superior Court to review the Council's decision. **Exhibit B**, §13(e), which the plaintiff failed to pursue.

acts.  Butz v. Economou, 438 U.S. 478 (1978).  In this case, the individual Town

Council members acted in a quasi-judicial capacity at the revocation proceeding.

After hearing the evidence put forth under oath, plaintiffs' counsel's cross-

examination of the Town's witnesses, the presentations of Town Manager

Therrien and plaintiffs' counsel, and review of plaintiffs' brief, they were charged

with deciding whether the plaintiffs violated the sexually oriented business

ordinance.  This quasi-judicial function entitles the Town Council defendants to

absolute immunity.  In addition, defendant Therrien's institution of the

enforcement action against the plaintiff and the prosecution of the Town's "case"

against the plaintiffs entitles them to absolute immunity for civil damages under §

1983.

**1. The Town Council Defendants Are Entitled to Absolute Immunity In Adjudicating whether Plaintiffs Violated the Town's Ordinance.**

The principles of absolute immunity were recently discussed by Judge

Arterton in an opinion where she granted summary judgment to a police officer

on a § 1983 claim where the plaintiff alleged that the officer had set an excessive

bail, on the basis of absolute immunity. Clynch v. Chapman, No. 3:01cv1685

(September 30, 2003).   Judge Arterton recited the law concerning absolute

immunity, as follows:

It is well established that officials acting in a judicial capacity are
entitled to absolute immunity against § 1983 actions, and this

immunity acts as a complete shield to claims for money damages. Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999).  The critical inquiry focuses on the nature of the act being performed and not on the status of the individual performing it.  See Forrester v. White, 484 U.S. 219, 224 (1988)("It is the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis."); see also Cleavinger v. Saxner, 474 U.S. 193, 201 (1985)(quoting Butz v. Economou, 438 U.S. 478, 511 (1987)("Absolute immunity flows not from rank of title or location within the Government,"…but from the nature of the responsibilities of the individual official.")  Thus, judicial immunity may extend to parole board officials who serve in a quasi-adjudicative function in deciding whether to grant, deny, or revoke parole, see Montero, 171 F.3d 757, but not to a judge who performs administrative, legislative or executive functions, such as discharging an employee, see Forrester, 484 U.S. at 229.

Under this functional approach, the Court examines, "the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and..seek[s] to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."  Id. at 224. To facilitate this analysis, the Second Circuit has extracted a two-part test from the Supreme Court's decision in Stump v. Sparkman, 435 U.S. 349 (1978), to determine whether a judge (or other official performing a judicial function) is entitled to absolute immunity: "First, a judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction…[;][s]econd, a judge is immune only for actions performed in his judicial capacity."  Tucker v. Outwater, 118 F.3d 930, 933 (2d. Cir. 1997)(quotation and citation omitted)(emphasis in original);see also Montero, 171 F. 3d at 761 n.2.

In the above case, Judge Arterton found the police officer's duty in setting

bail was quasi-judicial in nature, entitling him to immunity.  The hallmark factor to

be considered is whether the officer exercised "independent judgment". Judge

Arterton found that the officer did exercise the requisite judgment, shown by the officer's duties which included interviewing the detainee to obtain relevant information and then weighing the information to set bail. The individual council members in this case also exercised their "independent judgment" to determine whether the plaintiffs violated the town's ordinance. Thus, they are also entitled to absolute immunity.

The revocation proceeding in this case is also akin to the administrative enforcement proceeding discussed in the United Supreme Court's case of Butz v. Economou, 438 U.S. 478 (1978). In Butz, the Supreme Court found the Department of Agriculture's adjudicators were entitled to absolute immunity for their quasi-judicial acts. The Town Council members in Berlin also act in a quasi-judicial capacity pursuant to Section 13 of the ordinance concerning revocation proceedings. (**Exhibit B**). A public hearing is held, at which proceeding the licensee may request that the Town Manager or any other Town official who investigated the application or inspected the premises shall be present at the public hearing. Id. At such hearing, the licensee shall have the opportunity to present evidence on his behalf and shall have the right to cross-examine all Town officials and witnesses. Id. The Town Council conducts the hearing in the order and form and with such methods of proof as it deems fair and appropriate. Id. Although the rules of admissibility are not strictly applied, all testimony is given under oath. Id. After hearing the evidence presented, the Town Council

enters its vote to either sustain or overrule the Town Manager's action, issues written notice of its decision, stating the reasons therefore.  Id.  As apparent in this case, the Council must interpret the ordinance and apply it to the facts of the case.  The issue in this case was whether the "licensee, operator or employee has knowingly allowed any live performance or conduct featuring any specified sexual activities to occur on the licensed premises."  Defendants Ragazzi, Ward, Aresimowicz, and Cimadon believed there was sufficient evidence presented to find that the licensee knowingly allowed the prohibited conduct to occur and voted accordingly.  (**Exhibits N, O, P and Q**).

Public policy considerations are also present in this case.  Clynch, supra, at 16.  Fear of personal liability should not be permitted to interfere with the Town council's judicial function to determine whether a violation of the ordinance has occurred.  Furthermore, judicial review of the Council's decision is available, providing additional protections to the individual affected by the decision, rather than suing, individually, the persons making the decision.  Id; **Exhibit B**; see Butz, supra at 512.

In another case, the Ninth Circuit held that members of a growth management board which reviewed land use decisions were entitled to absolute immunity concerning compliance with the State of Washington's Growth Management Act.  Buckles v. King County, 191 F. 3d. 1127 (9th Cir. 1999).  Citing Butz , supra, the Ninth Circuit stated:

> [t]he doctrine of judicial immunity is supported by a long-settled
> understanding that the independent and impartial exercise of
> judgment vital to the judiciary might be impaired by exposure to
> potential damages liability.  Accordingly, the 'touchstone' for the
> doctrines' applicability has been 'performance of the function of
> resolving disputes between parties, or of authoritatively adjudicating
> private rights.' When judicial immunity is extended to officials other
> than judges, it is because their judgments are 'functional[ly]
> comparab[le'] to those of judges—that is, because they, too,
> 'exercise a discretionary judgment' as part of their function.
> Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36 (1993).

See also, Hyatt v. Town of Lake Lure, 225 F. Supp. 2d 647, 657 (The decisions of the Town Council members to deny [plaintiffs'] petition and appeal are quasi-judicial…As such the individual council members who voted against plaintiffs' appeal have absolute immunity from suit in their individual capacities based on these decisions).  For these reasons, defendants, Ragazzi, Ward, Aresimowicz and Cimadon, are entitled to summary judgment on the basis of absolute immunity.

### 2.  Defendant Therrien is also Entitled to Absolute Judicial Immunity for Bringing Enforcement Action against the Plaintiffs for Violating the Ordinance.

As the enforcing agent for the town's ordinance, defendant Therrien is also entitled to absolute immunity for her actions.  She served in a virtually identical capacity to that of a prosecutor, presenting the Town's "case" against the licensee before the Council.  In this capacity, she was analogous to the administrative officials functioning in a prosecutorial capacity who were granted immunity in Butz. The Supreme Court held:

> We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts.  The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution.  An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought.  …
>
> The discretion with executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete.

Id. at 516; see also, Smith v. Power, 346 F.3d 740, 743 (7th Cir. 2003)(City attorney who sent notice of violation to property owner for violation of building code entitled to immunity).  Therefore, summary judgment should be also granted in favor of defendant Therrien for her enforcement actions band on absolute immunity.

### D.    In the Alternative, the Individual Defendants are Entitled to Qualified Immunity.

#### 1. Qualified Immunity Generally.

Qualified Immunity shields public officials from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known.  Saucier v. Katz, 533 U.S. 194 (2001);. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Riccuiti v. N.Y.C. Transit Authority, 124 F.3d 123, 127 (2d Cir. 1997).  The doctrine of qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits.  Harlow, 457 U.S.

at 817-18; Lennon v. Miller, 66 F. 3d 416, 420 (2d. Cir. 1995).  This policy is justified in part by the concern that the "fear of personal monetary liability and harassing litigation will duly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638 (1987).  This doctrine "'strikes a balance between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.'" Poe v. Leonard, 282 F.3d 123 (2d Cir. 2002), citing Locurto v. Safir, 263 F. 3d 154, 162-3 (2d Cir. 2001).

Overcoming qualified immunity is a two-part process.  Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999).  First, the plaintiff must allege the violation of a clearly-established constitutional or statutory right. Id. Second, qualified immunity will only be denied if a reasonable official should have known that the challenged conduct violated that established right.  Id. at 142-143, citing Rodriguez v. Comas, 888 F.2d 899, 901 (1st Cir. 1989).  In other words, "even where the plaintiffs' federal rights and the scope of the permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Id., Lennon, 165 F.3d at 420, citing Anderson, 483 U.S. at 641.  "The objective reasonableness test is met—and the defendant is entitled to immunity –if 'officers of reasonable competence could disagree' on the legality of the defendant's action." Thomas, 165 F.3d at 143, citing Lennon, 66 F.3d at 420. The presumption in favor of finding qualified immunity is necessarily high,

protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs,, 475 U.S. 335, 341 (1986).

### 2. Standard for Summary Judgment on Qualified Immunity.

In evaluating a motion for summary judgment on the basis of qualified immunity, the Court must, as a threshold matter, inquire whether, construing the facts most favorably to the plaintiff, "the facts alleged show the officer's conduct violated a constitutional right." Poe v. Leonard, 282 F.3d 123, 132 (2002), citing Saucier v. Katz, 533 U.S. 194 (2001).  If so, the Court must determine whether the right in question was clearly established at the time the violation occurred, in other words, whether "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id.  The second inquiry has been further refined, and qualified immunity is established when '(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" Id., citing Teirney v. Davidson, 133 F. 3d 189, 196 (2d Cir. 1998).

> As the Supreme Court has explained, the 'concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular conduct....if the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to' immunity.  Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances, qualified immunity applies.

Id., (citations omitted).

### 3.  Defendant Council Members, Ragazzi, Aresimowicz, Ward and Cimadon, Are Entitled to Qualified Immunity.

Plaintiff claims its procedural due process right includes the right of council members not to caucus before plaintiffs' hearing.  While a broad right to "procedural due process" may exist and be clearly established, the plaintiff has no similar right for council members not to "caucus" or meet prior to a hearing. There is absolutely no evidence sufficient to defeat summary judgment that this meeting was for any improper or unconstitutional purpose.  **(Exhibits L, M, N, O, P** and **Q)**.   The purpose of the meeting was related to a political issue and the Mayor's attempt to name the successor to the Deputy Mayor position.  Id.  As such, defendants are entitled to judgment as a matter of law on the first prong of the qualified immunity analysis, because there is no evidence of a violation of a clearly established constitutional right.

In the alternative, defendants are entitled to qualified immunity based upon the "objective reasonableness" of their actions.  It was objectively reasonable for the individual Council members to believe that caucusing in the hallway prior to the public hearing would not violate Centerfolds' procedural due process rights, given that plaintiffs were afforded the opportunity to present their evidence and cross examine witnesses called by the town.   Based upon the undisputed facts of this case, which show the Council members met prior to the hearing for an unrelated purpose, it was objectively reasonable for them to believe they did not violate plaintiffs' due process rights.  Therefore, defendants

Cimadon, Ward, Ragazzi and Aresimowicz are entitled to qualified immunity and summary judgment should enter in their favor.

### 4. Town Manager Therrien is Entitled to Qualified Immunity.

Defendant Therrien's involvement in this case arose out of her enforcement of Section 12 of the ordinance.  On July 1, 2002, she read in the newspaper that the State of Connecticut Liquor Commission was going to revoke the plaintiff's liquor permit based upon the commission's investigation which found that employees of the plaintiffs' business were giving "lap dances" to customers, as well as committing other sexual activities which violated Berlin's ordinance.  **Exhibits C, D, E,** and **V.** Ms. Therrien requested a copy of the Commission's investigation and reports through the FOIA.  **Exhibits D** and **V.** Upon review of the activities documented by the Liquor Division officers which occurred on the plaintiffs' premises on August 19, 2001, she determined that the plaintiff had violated Berlin's ordinance. **Exhibits C, E** and **V**.  As a result, she revoked the permit under Section 12(b)(8) which provided, "the Town Manager shall revoke any license where any of the following occur (emphasis added);……(8) A licensee, operator or employer has knowingly allowed any live performance or conduct featuring any specified sexual activities to occur on the licensed premises……" **Id.**

In accordance with § 12 of the ordinance, Ms. Therrien then wrote Centerfolds on July 15, 2002, advising it that the Town would be revoking its

license.  **Exhibit C; Exhibit F**, Letter to Mr. Mario M. Pirozzoli, Jr./Centerfolds

from Ms. Therrien dated July 15, 2002.   Ms. Therrien also advised Centerfolds of

its right to appeal her revocation, as permitted by the ordinance.  **Exhibit F.**

Plaintiff did appeal the decision, and appeared before the Council at a hearing

through counsel, and was given an opportunity to cross-examine witnesses and

submit written argument.  See **Exhibits C, G** and **H**.

Recently, the Second Circuit reversed the judgment of the Northern

District of New York and held that the individually named defendants were

entitled to qualified immunity in their enforcement of New York's Non-resident

Lobster Law.  Connecticut v. Crotty, 346 F.3d 84, 101 (2d Cir. 2003).  While the

Court ultimately held that the law violated the Privileges and Immunities Clause

of Article IV of the United States Constitution, it also found that the individuals

who enforced that law were entitled to qualified immunity due to the fact that it

was presumptively valid.  The Court explained:

> …We consider many factors, but rely primarily on one factor as
> particularly persuasive:  that the challenged conduct involved
> enforcement of a presumptively valid statue.  Our heavy reliance on
> this factor is supported by well-settled principles of judicial restraint
> and deference to the presumptive validity of legislative
> enactments…We also note that, notwithstanding potential or even
> foreseeable constitutional challenge, 'until judges say otherwise,
> state officers…have the power to carry forward the directives of the
> state legislature, and that 'absent contrary direction, state officials
> and those with whom they deal are entitled to rely on a
> presumptively valid state statute, enacted in good faith and by no
> mean plainly unlawful,'

> Also informing our analysis is the Supreme Court's recognition in a different context that State officials 'are charged to enforce laws until and unless they are declared unconstitutional' and that '[t]he enforcement of a law foreclosed speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws…Indeed, '[s]ociety would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.'
>
> We see no reason why this principle is not applicable to the objective reasonableness question in qualified immunity analysis.

Id. at 102-103, citations omitted.

The Court relied on other Circuit Court decisions which held similarly. Grossman v. City of Portland, 33 F.3d 1200 (9th Cir. 1994)(invalidating a municipal ordinance prohibiting demonstrations in a public park without first obtaining a permit, but granting qualified immunity to the officer who arrested demonstrator pursuant to ordinance); Swanson v. Powers, 937 F.2d 965 (4th Cir. 1991), cert. Denied, 502 U.S. 1031 (1992)(former secretary of revenue entitled to qualified immunity for enforcing discriminatory taxing scheme). The Court concluded, "Thus, in the realm of objective reasonableness, we hold that enforcement of a presumptively valid statue creates a heavy presumption in favor of qualified immunity." Id. at 104.

As Ms. Therrien's involvement in this case arose out of the duties imposed upon her by the ordinance, which procedures she followed, she is entitled to qualified immunity.

**D.    First Amendment Challenge.**

**1. Summary of Argument.**

Plaintiffs take issue with several portions of the ordinance, as well as the ordinance as a whole, claiming:

1. The ordinance is irrational  (Complaint, ¶26);

2. The ordinance fails to distinguish between illegal acts, such as prostitution, and simulated acts of sexual conduct that violate no known laws, and which pose no threat of safety to any community or to anyone (Complaint ¶ 27);

3. The ordinance's description of enterprises composed of "booths, cubicles, studios and rooms" bears no relation to the plaintiffs' enterprise, and are, in fact, a thinly veiled attempt to put the plaintiffs out of business by treating his business as of the same sort and type as those in which such illegal activities as prostitution occur.  (Complaint, ¶28); and

4. The ordinance is overbroad in that it prohibits innocent contact between performers and patrons. (Complaint ¶ 29).

However, plaintiffs lack standing to bring a facial challenge to all the sections of the regulations, as several were never applied to them. To the extent plaintiffs do have standing to challenge specific portions of the regulation, other federal courts have upheld similar restrictions on adult entertainment which were applied to the plaintiffs.  Plaintiffs' general claim that the entire ordinance is irrational also fails as a matter of law, as the regulation is concerned with the adverse secondary effects of adult businesses, and survives the four-part test of United States v. O'Brien, 391 U.S. 367 (1968).

**2.  Standing and the Overbreadth Doctrine.**

Standing consists of both a "case or controversy" requirement stemming from Article III, §2 of the United States Constitution, and a subconstitutional "prudential" element.  To demonstrate Article III standing, plaintiff must demonstrate (1) that it has suffered an injury-in-fact, meaning an injury that is concrete and *particularized;*  (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. Granite St. Outdoor Ad. V. City of Clearwater, __ F.3d  __ (11th Cir. 2003)(Docket No. 02-14434)(November 28, 2003).  Even when this constitutional minimum has been met, judicially created prudential limitations may defeat a party's standing to maintain a suit.  Of the three prudential standing principles, "relevant here is the principle that a party generally may assert only his or her own rights and cannot raise the claims of third parties not before the court." Id. While the overbreadth doctrine may permit third-party standing when a statue is constitutionally applied to the litigant but might be unconstitutionally applied to third parties, is not an exception to the constitutional standing requirements.  Id.   "A plaintiff seeking to make an overbreadth challenge must first show that he has suffered an injury in fact, as required under Article III.  Id. An "injury in fact" requires the plaintiff to "show that he personally has suffered some actual or threatened injury." Id.  As a result, the court must look to the enforcement action taken against the plaintiffs in this case to determine their standing.

Town Manger Therrien's enforcement action was predicated on the plaintiffs' violation of § 1(b)6 which included "sexual physical contact between

employees and patrons of sexually oriented businesses and specifically include lap dancing or manual or oral touching or fondling of specified anatomical areas whether clothed or unclothed." **Exhibit C.** Violations were documented by officers of the state Liquor Control Division, in the report Ms. Therrien obtained under FOIA. At the revocation hearing, Ms. Therrien testified that her investigation revealed a violation of Section 12(b)(8) which provided, "the Town Manager shall revoke any license where any of the following occur:…(8) A licensee, operator or employer has knowingly allowed any live performance or conduct featuring any specified sexual activities to occur on the licensed premises;…" **Exhibit C, p. 2-3.** She also found that activities documented by the officers violated the prohibition against sexual activities, defined as "sexual physical contact between employees and patrons of sexually oriented businesses and specifically include "lap dancing" or manual or oral touching or fondling of specified anatomical areas, whether clothed or unclothed." Id. She also found that the officers documented exposing of breasts, pubic hair, genitals, touching, caressing, fondling and contact with the patrons. Id. She based her decision on a number of items that were violated under the definition of specified sexual activities. Id., p. 13

The Liquor Control Division report was also entered into evidence at the revocation hearing, which served as the basis for Ms. Therrien's decision. **Exhibit E.** On August 19, 2001, the officers documented exposure of breasts,

pubic hair and genitals, and sexual contact between a dancer and a patron, as

follows:

> At approximately 12:20 a.m., a female performer, later identified as
> Racquel A. Velez (who went by the stage name Adrianna) entered
> the main stage area and began to dance. She was wearing a green
> and while colored bikini top, black shorts, and black high-heel
> boots. As Ms. Valez danced, she removed her shorts, revealing a
> black g-string bottom, and lowered her bikini top so as to
> completely expose her breasts.  As Ms. Valez dances, patrons
> placed dollar bills on the stage in front of themselves.  Ms. Valez
> then moved around the stage, collecting the bills and dancing in
> front of the patrons who had placed them on the stage.  While
> dancing in front of these patrons she would touch, caress and
> fondle her breasts.  Ms. Valez would then lean over the edge of the
> stage and place her breasts against the patron's face and allow the
> patron to kiss and lick her breasts.  Ms. Velez would also sit on the
> stage facing the patron and with her legs spread would move her g-
> string to the side exposing her public hair and genitals.

> Another dancer was observed "to walk into a separate booth to the
> rear right of the premises.  Saunders was then observed to stand in
> front of a male, now seating and remove her clothing down to her
> "G" string.  Saunders was then observed to begin rubbing her right
> leg up an down on the male patron[']s groin area.  After a brief
> period the dancer moved to her knees and then began pressing her
> face directly into the male[']s groin area." She also danced on stage
> topless and caressed and fondled her exposed breast.  She then
> sat on the stage floor and while facing the patron briefly pulled the
> "G" string to the side exposing her genital area.  After a brief period
> she leaned forward and removed the currency and proceeded to
> the next person showing money."

Another dancer was also observed with her breasts fully exposed, rubbing

up and down the front of a patron, while another rubbed her fully exposed

breasts against a patron's chest, while the patrons were seated in  private dance

booths. Id.

33

Plaintiff alleges that Section 5 of the ordinance that prohibits physical contact between dancers and patrons is overbroad "in that it prohibits innocent contact between performers and patrons."  It is undisputed that the plaintiff was not subject to any enforcement action by the defendants for incidental touching between performers and patrons, as shown above.  Ms. Therrien cited the plaintiff for conduct which was clearly intentional touching between patrons and the dancers: lap dances which included physical contact of the dancers' fully exposed breasts with the patrons,  as well as dancers pressing their breasts into the faces of patrons and permitting licking and kissing of their breasts by the patrons during their performances.  For this reason, plaintiffs' challenge against this portion of the ordinance is a facial challenge, as opposed to an "as applied' challenge.  The plaintiff must meet a higher standard for standing on any facial challenge.  As the United Supreme Court recently reaffirmed in Virginia v. Hicks, 539 U.S. 113 (2003) on June 16, 2003:

> The First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges.  See *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984).  The showing that a law punished a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep," *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973), suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression," *id.,* at 613.  See also *Virginia v. Black*, 538 U.S. __, __ (2003); *New York v. Ferber,* 458 U.S. 747, 769, n. 24 (1982);  *Dombrowski v. Pfister,* 380 U.S. 479, 491, and n.7 497 (1965).

34

We have provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions.  See *Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 634 (1980);* Bates v. State Bar of Ariz., 433 U.S. 350, 380 (1977); *NAACP v. Button,* 371 U.S. 415, 433 (1963).  Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, *Dombrowski, supra,* at 486-487—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.  Overbreadth adjudication, by suspending **all** enforcement of an over inclusive law, reduces these social costs caused by the withholding of protected speech.

As we noted in *Broadrick,* however, there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interest in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.' 413 U.S. at 615.   For there are substantial social costs *created* by; the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct.  To ensure that these costs do not swallow the social benefits of declaring a law 'overbroad', we have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, *ibid.* before applying the 'strong medicine' of overbreadth invalidation, <u>*id., at 613.*</u>

In the instant case, plaintiffs' challenge of overbreadth is premised on a concern that non-intentional or "innocent" contact between patrons and performers is prohibited.  However, physical contact is not constitutionally protected speech or constitutionally protected conduct.  "Innocent" contact does not implicate a message worthy of constitutional protection.  Physical contact

between a nude dancer and a patron is not protected under the First

Amendment.  Baby Dolls Topless Saloons v. City of Dallas, 295 F.3d 471, 484

(5th Cir. 2002),rehearing denied (finding constitutional a ban on table dancing).

Patrons neither have any First Amendment right to touch a nude dancer.  Id.,

citing Hang On, Inc. v. City of Arlington, 65 F. 3d 1248 (5th Cir. 1995)(facial

challenge to "no touch" rule and "buffer zone" rule).  In addition to "no touch"

rules surviving scrutiny, courts have also held that so-called "buffer zone" and

stage height requirements, which obviously further restrict any potential contact

between dancers and patrons, are constitutional.  Kev, Inc. v.  Kitsap County,

793 F.2d 1053, 1061 (9th Cir. 1986); BSA Inc. v. King County, 804 F.2d 1104 (9th

Cir. 1996); G.M. Enterprises v. Town of St. Joseph, ___ F.3d ___ (7th Cir.

2003)(Docket No. 03-1428).  There is no evidence that the ordinance has been

or will be used in a manner suggested by the plaintiff, to revoke a permit based

upon accidental contact.  For all these reasons, there is no evidence that any

constitutionally protected speech will be chilled and as a result, plaintiffs'

overbreadth challenge must fail.

Plaintiff also challenges the reference in the ordinance to enterprises

composed of booths, cubicles, studios and rooms, and claims the ordinance is

unconstitutional in that plaintiffs' enterprise has no such booths, cubicles, studios

or rooms.  Plaintiffs do not claim that the section of the Berlin ordinance

concerning sexually oriented businesses applicable to "booths, cubicles, studios

and rooms" was applied to Centerfolds in any way.  However, even if this section

was applied to the plaintiff, it is constitutional, as such restrictions have been

uniformly upheld.  See, e.g. <u>Pleasureland Museum, Inc. v. Beutter</u>, 288 F.3d 988

(7th Cir. 2002); <u>Scope Pictures of Missouri v. Kansas City</u>, 140 F.3d 1201 (8th Cir.

1998); <u>Doe v. City of Minneapolis</u>, 898 F.2d 612 (8th Cir. 1990); <u>Mitchell v. Com'n

on Adult Entertainment Est.</u>, 10 F.3d 123 (3d Cir. 1993); <u>Bamon Corp v. City of

Dayton</u>, 923 F2d 470 (6th Cir. 1991).

Plaintiffs' hypothetical, abstract arguments are insufficient to survive a

challenge to their standing.  In addition, as further shown below, the ordinance is

constitutional.  Therefore, summary judgment should be granted in favor of the

defendants on plaintiffs' overbreadth challenge to Berlin's ordinance.

### 3. The Sexually Oriented Business Ordinance is Constitutional.

Plaintiff alleges that the reference to businesses with cubicles and booths

bears no relation to its business and "are, in fact, a thinly veiled attempt to put the

plaintiffs out of business by treating his business as of the same sort and type as

those in which such illegal activities as prostitution occur."  Defendants are at a

loss to understand what this allegation means.  Plaintiff also generally alleges

that the ordinance is "irrational".  What is clear is that municipalities may regulate

sexually oriented businesses, including cabarets such as the plaintiff which

provide live nude entertainment.  This type of entertainment is at the edge of First

Amendment protection.  Barnes, 501 U.S. at 566, 111 S.Ct. 2456; City of Renton v. Playtime Theatres, Inc.,475 U.S. 41,  49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1985); Young v.American Mini Theatres, Inc.,427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) ("it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political speech").  It is well established that communities may regulate adult uses and that these types of uses carry with them adverse secondary effects.  Alameda Books v. City of Los Angeles,  535 U.S. 425 (2002)(plurality opinion).

Cases involving nude dancing are subject to the four-part test crafted by the United States Supreme Court in United States v. O'Brien, 391 U.S. 367 (1968).  See Barnes v. Glen Theatre, Inc., 501 U.S. 560, 567-8 (1991). An ordinance is constitutional if: (1) it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.  Id., citing O'Brien at 376-77.  There can be no dispute that it is within the power of the Government to regulate nude dancing.  Barnes at 567.  It is also indisputable that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial.  Center for Fair Public Policy v. Maricopa Cty., 336

F.3d 1153, 1166 (9th Cir. 2003), citing <u>Young v. American Mini Theaters</u>, 427 U.S. 50, 71 (1976); <u>Renton</u>, 475 U.S. 41, 50 (1986), <u>Alameda Books</u>, 535 U.S. at 435.  When an ordinance regulates adult uses based upon their adverse secondary effects, they are content-neutral, under the third prong of the <u>O'Brien</u> test.  <u>Id</u>.  The Court may look to the text of the ordinance and the legislative history to determine whether the ordinance is concerned with these adverse secondary effects.  <u>Id</u>.  Berlin's ordinance evinces the Council's intent and concern with the adverse secondary effects of sexually oriented businesses.  The preamble cites this concern and the purpose and intent of the Council is also clearly stated.  **Exhibit B**, §1   It also regulates businesses such as the plaintiffs' and those which enjoy no such protection such as massage parlors, escort services and encounters.  <u>Id</u>., See also <u>Alameda Books</u> at 447 (Kennedy, J., concurring). Plaintiffs' argument that the classification of its business with such other types of businesses does not evince an intent to shut it down, but shows that the regulation is content-neutral, and does not classify establishments based upon a dislike of the message or speech.  <u>Id</u>.

The legislative history also shows the Council's intent to regulate such businesses within Constitutional constraints and respect for the First Amendment rights of Berlin's adult citizens to avail themselves of adult materials and entertainment.  **Exhibit U**.

As to <u>O'Brien's</u> fourth prong,  the Court applies intermediate scrutiny, which evaluates whether the regulation is "designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication." The critical issue is whether there is a reasonable record to support the ordinance based upon the secondary effects. <u>Center for Fair Public Policy</u>, at 1166, citing <u>Renton</u>, 475 U.S. at 50.  Again, the evidence in this case including the stated purpose and intent in the text of the ordinance itself and the Summary which accompanied its enactment, citing to the experiences of other municipalities in Connecticut such as Hartford and other municipalities across the country, satisfies the substantial relation test.  All this evidence was reasonably relied and considered relevant to Berlin to support its ordinance. <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277 (2000); <u>City of Los Angeles v. Alameda Books, Inc.</u>, 535 U.S. 425 (2002)(plurality opinion).

Berlin sought to thoroughly study the issue, and passed a six month moratorium on sexually oriented businesses, followed by a three month extension moratorium, beginning in October 1999 in which to do so.  During this time the Berlin Town Council Ordinance Committee included Council members/defendants Ida Ragazzi and Linda Cimadon, as well as Mayor Paul Argazzi. **Exhibit U.** During the moratorium the Ordinance Committee studied the experiences of several towns such as Chattanooga, Tennessee, Dallas, Texas,

Seattle, Washington, and Marion County, Indiana.  Id.  The Chattanooga,

Tennessee study disclosed that from 1993-1995 undercover agents frequented

the "adult cabarets" there and discovered there was a considerable amount of

body contact between patrons and dancers.  Id.  Many clubs offered sofa/couch

or "VIP" dances, where the patron is taken to a remote semi-private area in the

club.  Id.  These "dances" also known as "lap dancing" often involved the female

dancers sitting in the patron's lap placing their breasts against the patron's face;

gyrating in such a manner as to simulate sexual intercourse; while maintaining

physical contact with the patron; breathing heavily into the patron's groin area;

and biting, gnawing and/or fondling the genitals of the male patrons through

clothing.  Id. The Ordinance Committee concluded that Berlin, like other

municipalities, was susceptible to the proven secondary effects of sexually

oriented businesses.  Id.  Of particular concern to Berlin the existence of the

Berlin Turnpike, a major commercial thoroughfare that bisects the Town.  Id. In

addition, the Committee consulted Attorney Daniel Silver, an attorney who

regularly represents sexually oriented businesses.  **Exhibits N** and **Q.**

Even ordinances with a scant or "slim" legislative record (which is not this

case) have been upheld.  Center for Fair Public Policy at 1167.  "Very little

evidence is required" to justify a secondary effects ordinance.  Alameda Books,

435 U.S. at 451 (Kennedy, J., concurring); see also Barnes v. Glen Theater, Inc.,

501 U.S. 560, 584 (Souter, J. concurring)("legislation seeking to combat the

secondary effects of adult entertainment need not await localized proof of those

effects).  As previously cited in this memorandum, similar restrictions on physical

contact have been upheld under intermediate scrutiny. Similar bans on exposure

of breasts and genitalia, and prohibitions of fondling one's breasts have also

been upheld.  Erie v. Pap's, supra; Fly Fish, Inc. v. City of Cocoa Beach, 337

F.3d 1301 (11th Cir. 2003)(ban on totally nude dancing upheld); SOB v. City of

Benton, 317 F.3d 856 (8th Cir. 2003)(ban on fondling upheld); Barnes, 501  U.S.

at 572 (ban on totally nude dancing upheld); Threesome Entertainment v.

Strithmather, 4 F. Supp. 2d 710 (N.D. Ohio 1998)(prohibiting complete nudity or

fondling upheld).

Therefore, the defendants are entitled to summary judgment as the

ordinance satisfies as a content-neutral, time place and manner restriction on

speech, which serves a substantial governmental interest of combating the

negative secondary effects associated with adult entertainment.

**III.    CONCLUSION:**

The authorities cited above demonstrate that the Town of Berlin's

ordinance is a constitutional exercise of the police power to regulate the adverse

secondary effects of sexually oriented businesses.  As a result, the Town of

Berlin is entitled to summary judgment on plaintiffs' First Amendment claim.  As

to the claims against the individual defendants, defendants are entitled to

summary judgment based upon either absolute or qualified immunity.

DEFENDANTS,

TOWN OF BERLIN, BONNIE L.
THERRIEN, IDA RAGAZZI, JOANNE
WARD, JOSEPH ARESIMOWICZ
AND LINDA CIMADON


By_____
   Thomas R. Gerarde
   ct05640
   tgerarde@hl-law.com
   Melinda A. Powell
   ct17049
   mpowell@hl-law.com
   Howd & Ludorf
   65 Wethersfield Avenue
   Hartford, CT  06114
   (860) 249-1361
   (860) 522-9549 fax

**CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail, to the following counsel of record this 23rd day of February, 2004.

Norman A. Pattis, Esquire
51 Elm Street, Suite 409
New Haven, CT  06510

_____
Thomas R. Gerarde