# EXHIBIT 4

Agenda Item No. $1(10)$
Request for Town Council Action

TO: The Honorable Mayor and Town Council

FROM: Bonnie L. Therrien, Town Manager BV

DATE: May 25, 2000

SUBJECT: An Ordinance Concerning Sexually Oriented Businesses

Summary of Agenda Item:

The Ordinance Committee chaired by Councilor Argazzi has moved the ordinance out of committee to have action taken by the full council. Attached you will find a sexually oriented business summary and a copy of the Ordinance Concerning Sexually Oriented Businesses.

Action Needed:

Set a public Hearing Date

Attachments:

Sexually Oriented Business Summary
Copy of Ordinance

Prepared By: Herman Middlebrooks, Jr., Assistant to the Town Manager

# SEXUALLY ORIENTED BUSINESS SUMMARY

This summary has been prepared for the Berlin Town Council by the Town Council Ordinance Committee to provide an informational overview regarding the regulation of sexually oriented businesses as it relates to proposed ordinance 5-00, An Ordinance Concerning Sexually Oriented Businesses. Much of the information contained in this summary was borrowed from a similar summary prepared by the Newington Town Attorney as well as information from other Connecticut municipalities and state and federal court decisions.

## I. BACKGROUND

In numerous cities and towns throughout the United States, including several in the State of Connecticut, municipal legislative bodies have passed ordinances designed to protect the general welfare, health and safety of their citizens and communities from the deleterious secondary effects of unregulated adult-oriented establishments, also known as sexually oriented businesses (SOBs). Many cities and towns such as Newport News, Virginia, Dallas, Texas, Marion County, Indiana, Chattanooga, Tennessee, and Seattle, Washington have studied the occurrence within their communities of problems associated with the operation of SOBs. The studies conducted by these and other cities and towns have shown that SOBs, if allowed to operate without regulation, have negative secondary effects on the surrounding communities. Such negative secondary effects include, but are not limited to, an increase in high-risk sexual activity and prostitution, resulting in higher risk of public exposure to communicable diseases and AIDS, property devaluement, increased criminal activity, and a decline of retail trade. The experiences of several cities and towns that had unregulated SOBs have been recited in several District Court cases.

The city of Chattanooga, Tennessee, prior to the enactment of an ordinance regulating the operation of SOBs, experienced a substantial law enforcement problem due to the SOBs in existence there. Between 1982 and 1986, Chattanooga police officers made 112 arrests at "adult entertainment" establishments for sex related crimes such as prostitution, selling obscene material to juveniles, indecent exposure, assignation, and solicitation to commit an unnatural sex act. Other numerous arrests were made for gambling, assault and battery, and public drunkenness. Arrests included employees of the establishments, in addition to patrons. It was also documented that on numerous occasions, plainclothes police officers and others at these places had been grabbed by the genitals or otherwise solicited for homosexual activity.[1]

Further, establishments that provided closed booths for viewing adult-oriented entertainment were found to be in unsanitary, filthy conditions. Police officers had found semen and blood on the walls, floors and video screens; dirty Kleenex stuck to the walls; condoms on the floors; and defecation and urine on the floors. Further, the police officers found that the private booths often contained "glory holes" or holes cut or smashed out between booths to

---

[1] See Broadway Books, Inc. v. Roberts, 642 F. Supp. 486 (E.D. Tenn. 1986).

1

permit interbooth sexual activity. They also observed more than one person enter one of these booths and observed people masturbating in them.[2]

At one establishment in Chattanooga, the police department was called 262 times between 1979 and 1984. The crimes included assaults and sex crimes, including rape, prostitution and indecent exposure. From 1993-1995, undercover agents from Chattanooga's police department frequented the "adult cabarets" there and discovered that a considerable amount of bodily contact was occurring between patrons and dancers. Many clubs offered sofa/couch or "VIP" dances, where the patron is taken to a remote semi-private area in the club. These "dances", also known as "lap dancing", often involve the female dancers sitting in the patron's lap; placing their breasts against the patron's face; gyrating in such a manner as to simulate sexual intercourse, while maintaining physical contact with the patron; breathing heavily into the patron's groin area; and biting, gnawing, and/or fondling the genitals of male patrons. In both the stage dances and the semi-private dances, dancers were observed pulling patrons' faces into their vaginal areas.[3]

In one Delaware community with unregulated SOBs, some residents discussed the various problems caused by the adult entertainment establishments, including the performance of sexual acts in public places, the presence of discarded sexually oriented material on residential lawns, excessive noise, and parking problems.[4] In that community it was police experience that private viewing booths were "little more than masturbation booths" and that "seminal fluid was commonly found dripping down the walls and on the floor in puddles."[5]

The Town of Berlin, like other municipalities, is susceptible to the proven secondary effects of SOBs. Of particular concern to Berlin is the existence of the Berlin Turnpike, a major commercial thoroughfare that bisects the Town. The Berlin Turnpike has been a magnet for SOBs and, with its increased development, will continue to attract these types of businesses. Other areas of Berlin have been and will continue to be targets of SOBs.

Several Connecticut municipalities have passed legislation in order to prevent their communities from experiencing the negative secondary effects of SOBs that have been experienced in other communities. These include East Hartford, Windsor, Tolland, Branford, Bristol, Burlington, Colchester, Cromwell, Enfield, Newington, Somers, and Torrington. Additionally, Bloomfield, Canton, Clinton and Deep River have ordinances regulating massage parlors. Many towns have zoning rules regulating the location of SOBs. Municipal legislation that regulates such establishments falls within the police power conferred on the municipalities by state statute.[6]

---

[2] Ibid.
[3] DLS, Inc. v. City of Chattanooga, 894 F.Supp. 1140, 1146 (E.D.Tenn. 1995).
[4] Mitchell v. Commission on Adult Entertainment Est., 10 F.3d 123 (3rd Cir. 1993).
[5] Id at p. 142.
[6] Connecticut General Statute §7-148(c)(7)(H)(ii) states that a municipal corporation organized and existing pursuant to the Constitution and laws of the State of Connecticut is authorized to "regulate and prohibit the carrying on within the municipality of any trade, manufacture, business or profession which is, or may be, so carried on as to

All of these existing SOB ordinances have been thoroughly reviewed by the Town Council Ordinance Committee. Most are rooted in the ordinance adopted by East Hartford on June 6, 1989 entitled "Regulation of Adult-Oriented Establishments". This ordinance survived constitutional scrutiny by the United States Court of Appeals for the Second Circuit.[7] Existing SOB ordinances by and large "rubber stamp" the most recently adopted SOB ordinance in the state to the point of embarrassing repetition. Outdated language, inconsistent procedure, and even typographical errors have been passed on from one ordinance to the next with obviously little effort to correct them by municipal officials.

## II. FIRST AMENDMENT JURISPRUDENCE - OVERVIEW

The United States Supreme Court has afforded First Amendment protection to sexually explicit "non-obscene" films, live presentations, and printed matter.[8] Although the Supreme Court has indicated that sexually explicit material may be only marginally protected under the First Amendment,[9] it is, nevertheless, protected speech-related activity, which may not be suppressed on the basis of its content. However, the United States Supreme Court and the United States District Court for the District of Connecticut have upheld as constitutional under the First Amendment ordinances that have been enacted with the predominate purpose of ameliorating socially adverse secondary effects of SOBs. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Grunberg, et al v. Town of East Hartford, et al, 736 F.Supp. 430 (D. Conn. 1989). Such regulations have been held to be "content-neutral," meaning that the regulation is not aimed at suppressing the content of the speech-related activity, but rather at the time, place and manner of the activity as it effects a substantial government interest. Under the Renton case, reasonable time, place and manner regulations of protected speech are valid if: (1) they are justified without reference to the content of the regulated speech; (2) they are narrowly tailored to serve a

---

become prejudicial to public health, conducive to fraud and cheating, or dangerous to, or constituting an unreasonable annoyance to, those living or owning property in the vicinity."
   See also, Connecticut General Statute §7-148(c)(7)(H)(xi) which provides further authority for the Town to "provide for the health of the inhabitants of the municipality and do all things necessary or desirable to secure and promote the public health." Additionally, Connecticut General Statute §7-148(c)(7)(H)(xiii) authorizes the Town to "make and enforce police, sanitary or other similar regulations and protect or promote the peace, safety, good government and welfare of the municipality and its inhabitants."
[7] Grunberg v. Town of East Hartford, 736 F.Supp. 430 (D. Conn. 1989, Burns, CJ), affirmed per curiam, sub nom, Singer v Town of East Hartford, 901 F.2d 297 (2d Cir. 1990).
[8] Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Barnes v. Glen Theatre, Inc., et al, 501 U.S. 560 (1991).
[9] Barnes v. Glen Theatre, Inc., et al, at p. 555-556. See also, Young v. American Mini Theatres, Inc., 427 U.S. 50, 70 (1976) where the Court stated, "[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment." (Voltaire, referring to a suggestion that the violent overthrow of tyranny might be legitimate, said: "I disapprove of what you say, but I will defend to the death your right to say it." Citing S. Tallentyre, The Friends of Voltaire 199 (1907)). Also in Young, the Court held that even though such sexually explicit films are protected from total suppression, that "within the area of protected speech, a difference in content may require a different governmental response." Id at 66.

significant or substantial government interest; and (3) they leave open ample alternative channels of communication.[10]

The "time, place and manner" provisions in regulations regarding SOBs vary depending on which harmful secondary effects a legislative body focuses on ameliorating. Regulations aimed solely at preventing the spread of the HIV virus that causes AIDS may limit closed booths or physical contact at SOBs. Regulations that focus on several harmful secondary effects, such as sex crimes, spread of infectious diseases, unsanitary public places, and the decline in property values, may include a licensing requirement, a closing-hours requirement, and/or a zoning regulation, in addition to limitations on closed booths and sexual physical contact. In several communities, a ban on total nudity was imposed in an effort to protect societal order and morality.[11] Every federal court that has heard a constitutional challenge to an "open-booth" requirement has found that it passes the test of narrowness.[12]

Unlike the open-booth requirements, licensing requirements for SOBs have been constitutionally challenged in the courts with some success. Licensing schemes have been challenged as a "prior restraint" on First Amendment rights. Licensing procedures must place specific and reasonable time limits within which the decision-maker must issue the license and must also provide for the possibility of prompt judicial review.[13] Further, licensing requirements must be carefully drafted so as not to place "unbridled discretion in the hands of a government official or agency."[14] Licensing requirements must be substantially related to the government interest that is being protected and must not pass judgment on the content of the protected expression, or else they may be violative of the First Amendment. In one instance, a licensing provision that requested disclosure of information about any stockholder holding five percent or more of stock of a corporate applicant, or a limited partner in a partnership applicant, was held unconstitutional because it was "impermissibly broad."[15] In that same case, permitting procedures and procedures for renewals and revocations of licenses and permits were held to be unconstitutional because there were no provisions for judicial review of a denial, or time limits on the decision to grant a renewal.[16] In another case, an ordinance imposing a civil disability provision, which prohibits individuals convicted of certain crimes from obtaining a license to operate an SOB for a specified number of years, was held to be unconstitutional as to five of the specified crimes listed because they were not sufficiently related to the purposes of the

---

[10] Renton, supra at 50.
[11] See Barnes, supra and O'Malley v. City of Syracuse, 813 F.Supp. 133 (N.D.N.Y. 1993).
[12] Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243 (9th Cir. 1982); Wall Distributors, Inc. v. City of Newport News, 782 F.2d 1165 (4th Cir. 1986); FW/PBS, Inc. v. City of Dallas, 837 F.2d 1298 (5th Cir. 1988); Broadway Books, Inc. v. Roberts, 642 F.Supp. 486 (E.D. Tenn. 1986); Grunberg v. Town of East Hartford, 736 F.Supp. 430 (2nd Cir. 1989); Mitchell v. Commission on Adult Entertainment Est., 10 F.3d 123 (3rd Cir. 1993).
[13] FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990). See also, Freedman v. Maryland, 380 U.S. 51 (1965).
[14] Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 757 (1988).
[15] See DLS, Inc. v. City of Chattanooga, 894 F.Supp. 1140, 1149 (E.D.Tem. 1995), where the District Court held that "license disclosure requirements for corporate applicants must be directed at those who have a 'controlling or significant share' in the corporation."
[16] Id.

ordinance.[17] The City of Dallas amended the ordinance in conformity with the District Court's judgment, striking those licensing provisions that were found to be unconstitutional. The Court of Appeals for the Fifth Circuit affirmed the District Court's ruling and upheld the civil disability provisions, as amended, on the ground that the relationship between "the offense and the evil to be regulated is direct and substantial." Although this case was brought to the Supreme Court, the Court never reached the issue of whether the ordinance was properly viewed as a content-neutral time, place, and manner restriction aimed at secondary effects arising out of the SOBs because the Court concluded that the city's licensing procedure was an unconstitutional prior restraint since it lacked the adequate procedural safeguards.

Unfortunately, no Court having judicial authority in Connecticut has heard the issue of whether licensing provisions for SOBs are content-neutral time, place and manner restrictions. Therefore, those Connecticut municipalities that wish to provide licensing requirements in order to control the harmful secondary effects of SOBs must do so without knowing that such regulations will be upheld under a constitutional challenge. In order to minimize the chance for constitutional challenge, regulations imposing licensing schemes should be drafted very carefully, providing for specific time limits and prompt judicial review, in addition to restricting licensing requirements to only those means that are narrowly tailored to achieve the municipality's goals.

## III.  CONCLUSION

The Town Council for the Town of Berlin wishes to protect its citizens and community from the adverse secondary effects of SOBs that have been experienced in other communities. These harmful secondary effects include: (1) an increase in the risk of communicable diseases, including AIDS and Hepatitis B; (2) an increase in crime, especially sex-related crime; (3) a decline in property values; and (4) unsanitary public places. The Town has a substantial government interest in protecting, preserving and promoting the health, safety and welfare of its citizens and those persons who patronize Berlin businesses and establishments. Proposed Ordinance 3-00, An Ordinance Concerning Sexually Oriented Businesses, has been introduced to accomplish the goals of the Town Council by regulating SOBs so that the occurrence of the harmful secondary effects that result from the unregulated operation of such businesses is lessened.

The Town Council Ordinance Committee conducted a thorough review of existing legislation and court decisions addressing SOBs. Unlike other Connecticut municipalities that have adopted SOB ordinances, Berlin's proposed ordinance represents an all-encompassing yet narrowly tailored regulation of the SOB industry that is consistent with existing law. The ordinance's licensing procedure is thorough, extensive and specific, and is tailored to Berlin's

---

[17] FW/PBS, Inc. v. City of Dallas, 648 F.Supp., at 1074. The District Court struck bribery, robbery, kidnapping, organized criminal activity and violations of controlled substances acts from the list of crimes that would prohibit an individual from obtaining a license. Additionally, the District Court struck a provision imposing a civil disability merely on the basis of an indictment or an information, reasoning that there were less restrictive alternatives to achieve the city's goals.

governmental structure. The proposed ordinance is at the cutting edge of SOB ordinances in Connecticut and, depending on the development of the law in this area, should serve the Town well for years to come.

Berlin Town Council Ordinance Committee
Paul C. Argazzi, Chairman
Ida M. Ragazzi
Linda Z. Cimadon